**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF NEW YORK**

| | | |
|---|---|---|
| **LEON BLACK,** *Plaintiff* | ) | |
| **v.** | ) | **Case No.: _______________** |
| **ROBERT GARCIA,** *Defendant.* | ) | **JURY TRIAL DEMANDED** |

**COMPLAINT WITH JURY DEMAND**

1. This is a case about a United States Congressman who knew the truth but told the country the opposite. On June 26, 2026, U.S. Representative Robert Garcia sat in a hearing room and listened as Leon Black, the co-founder of one of the world's largest investment firms, explained to a room full of Congressmen that he had no knowledge of Jeffrey Epstein's crimes and took no part in them. Mr. Black appeared that day expressly to be open and honest about the entire story of his relationship with Epstein, which is exactly what he did. Yet shortly after, Congressman Garcia went on national television and lied to the American people, claiming that "Leon Black is at the center of Jeffrey Epstein's crimes." Weeks after that, he went on television and lied again, asserting that Mr. Black "was one of the last people to actually interact with [Epstein] before Jeffrey Epstein committed suicide," and that he had "talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein's trafficking network." Those statements were false and Congressman Garcia knew it. But he chose to disregard the truth to further a preconceived narrative that benefitted his personal and political agenda. Congressman Garcia's knowing lies have caused real and significant ongoing harm to Mr. Black. His physical safety has been threatened, he has

received a barrage of hateful calls, emails, and social media posts, and his business and philanthropic endeavors have suffered.

2. On June 26, 2026, Leon Black voluntarily sat for a transcribed interview with the United States House of Representative's Committee on Oversight and Government Reform to, in his own words, "set the record straight about [his] relationship with Jeffrey Epstein, and in particular why [he] paid [Epstein] the money [he] did."

3. Present at the interview that day was, among others, Ranking Member Robert Garcia.

4. Mr. Black made clear that he "did not know about this nefarious activity until Epstein was charged with trafficking in July 2019" and that he "feel[s] terrible for Epstein's victims."

5. He went into detail about why he gave Epstein a second chance and paid him for professional services. He also explained that he "severed [his] connection to Epstein in 2018" and learned, after Epstein's arrest, about the terrible crimes Epstein committed.

6. Mr. Black explained that he asked for an independent investigation into his relationship with Epstein because he "*had nothing to hide*." He told the Committee—and the American people—that the investigation, led by the Dechert law firm and a former federal prosecutor from the Southern District of New York, spent three months examining over 60,000 documents and interviewing 20 people, concluded that Mr. Black did not know about Epstein's criminal activities and that Mr. Black paid Epstein $158 million for legitimate tax and estate planning services.

7. Mr. Black described how Epstein duped and deceived everyone, including him. Mr. Black said he knew Jekyll, but not Hyde. He then told the Committee that he fired Epstein in 2018

"after growing tired of his relentless pursuit of more and more money . . . his mistruths and misrepresentations . . . and his failure to repay most of the $30 million demand loan" he had made.

8. Mr. Black also told the Committee that he had been publicly sued three times, by three women claiming ties to Epstein, who had made horrific allegations against him. He explained that a single plaintiffs' law firm, the Wigdor firm, represented all three women. And that firm also brought the allegations to the Manhattan District Attorney and the Department of Justice, but they did not pursue charges.

9. He also explained how two of those three cases had been dismissed with prejudice. He told the Committee: "the first plaintiff never met Epstein and her claims were wholly without merit. I never even met the second plaintiff."

10. And in the third lawsuit—which has since also been dismissed with prejudice—he explained how a federal judge, appointed by President Biden, issued a 76-page ruling sanctioning the plaintiff, the lawyer, and the Wigdor firm, for "outright lying and submitting false and fraudulent evidence." Mr. Black described how "[t]he plaintiff in that case had testified under oath—incredibly—that she gave birth to four of Epstein's children, three of whom were kidnapped at birth."

11. He also unequivocally stated: "To be clear, I categorically deny the baseless and fabricated allegations in that case and in the other two lawsuits that were filed against me and that have now been dismissed."

12. That same day—after sitting through the entire hearing and listening as Mr. Black testified to the opposite—Congressman Garcia falsely told a nationwide audience on MS NOW that "Leon Black is at the center of Jeffrey Epstein's crimes." ***This was a lie.***

13. And that hearing room wasn't the only place Congressman Garcia was informed of

the truth about Mr. Black. It was also delivered to him in hard copy. In the months following Mr. Black's transcribed interview, Mr. Black's counsel sent him multiple letters providing specific, documented evidence that Mr. Black did not know about Epstein's crimes, was not a part of them whatsoever, and that the accusations made against him in the lawsuits were frivolous. Congressman Garcia received the Dechert Report, a federal judge's opinion discrediting an accuser, and DOJ files indicating that both the Department of Justice and Manhattan District Attorney had declined to prosecute Mr. Black based on those outrageous and false allegations.

14. Yet, on September 14, 2026, Congressman Garcia appeared on *Money, Power, Politics with Stephanie Ruhle* on MS NOW—in their New York City studio—and falsely stated that Leon Black "was one of the last people to actually interact with him before Jeffrey Epstein committed suicide" and "we've talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein's trafficking network." ***These were also lies.***

15. Congressman Garcia's September 14 statements and accusations are false and harmful.

16. Congressman Garcia's inflammatory claim that Mr. Black was one of the last people to interact with Epstein was not an innocent mischaracterization; the Dechert Report concluded that Mr. Black stopped communicating with Epstein in October 2018. Mr. Black said as much during his testimony. Congressman Garcia was present during Mr. Black's testimony and had a copy of the Dechert Report and letters summarizing its findings.

17. And at the time of Congressman Garcia's statements, two of the three cases filed against Mr. Black had been dismissed *with prejudice*, and the third faced case-crippling sanctions due to falsification of evidence and outright lies to the court. Again, Congressman Garcia knew

his statements were false—or recklessly disregarded the truth—because Mr. Black had given ample evidence that these claims were untrue.

18. Each of Congressman Garcia's statements was an assertion of fact about Mr. Black—not opinion—and each was false.

19. Congressman Garcia's false statements accused Mr. Black of serious crimes—being complicit in sex trafficking and the abuse of women.

20. Members of Congress are free to report to constituents about their work as legislators. But traveling to a New York television studio to falsely brand a private citizen a sex trafficker is a wholly different matter. That is not a part of any Member's job.

21. Epstein's activities were heinous and awful. Congressman Garcia knows that by continuing to connect Mr. Black to Epstein he will benefit personally by aligning himself with the large portion of the electorate that is, rightfully, enraged and politically energized by Epstein's crimes.

22. On September 15, 2026, the day after Congressman Garcia went on MS NOW and told lies about Mr. Black, he received another letter from Mr. Black's counsel. That letter reiterated what Mr. Black told the Committee in his opening statement: Of the cases accusing him of sexual misconduct, two of them had been dismissed with prejudice and the third faced crippling sanctions from a federal judge.

23. Mr. Black told Congressman Garcia in that September 15 letter that he supports his efforts and those of the Committee to establish the facts about Epstein and to prevent human trafficking. Congressman Garcia simply ignored him.

24. On October 15, 2026, the third lawsuit against Mr. Black was dismissed with prejudice. In the wake of the federal judge's sanctions opinion, the Wigdor attorney who had

spearheaded the campaign against Mr. Black left the firm. Jane Doe then moved for the case to be dismissed with prejudice. Mr. Black did not offer Jane Doe anything in exchange for dismissal and he did not settle with her whatsoever.

25. Days later, on October 19, 2026, undersigned counsel for Mr. Black sent Congressman Garcia a written demand letter identifying his false statements, explaining and providing evidence of their falsity, and requesting that Congressman Garcia publicly retract the lies. In that letter, Mr. Black also told Congressman Garcia that the third—and final—lawsuit had also been dismissed with prejudice.

26. Mr. Black didn't ask Congressman Garcia to stop pursuing the truth about Epstein. He didn't ask him to stop talking about his relationship with Epstein or the fact that he paid him $158 million. ***All Mr. Black asked Congressman Garcia to do was tell the truth.***

27. Congressman Garcia's office acknowledged receipt of the October 19 letter, but he has since refused to respond. His false statements remain publicly available, including on his social media accounts, MS NOW, and YouTube.

28. Based on the false statements from Congressman Garcia, Mr. Black has received scores of hateful and threatening emails, phone calls, letters, and social media posts directed at him. He has received so many of them that he had to hire a private security company to assess the physical risk against him, and that company assessed the physical risk to him and his family as "HIGH."

29. Congressman Garcia is a member of the United States House of Representatives. He knows what is right and wrong. And he knows it is wrong to knowingly tell lies about people. Mr. Black brings this lawsuit to hold Congressman Garcia accountable for the damage caused by these horrible lies.

## PARTIES

30. Plaintiff Leon Black is an individual and citizen of the State of New York. Mr. Black is the co-founder and former Chairman and Chief Executive Officer of Apollo Global Management, one of the largest alternative-investment firms in the world. He is also a well-known philanthropist. Over a decades-long career in finance, Mr. Black built a national and international reputation for integrity in his business and personal dealings.

31. In addition to his work at Apollo, Mr. Black has spent more than three decades working as a dedicated philanthropist and one of the nation's leading benefactors of the arts, education, and cancer research. He served for 20 years on the Board of Mount Sinai Hospital—where he also donated $10 million to establish The Black Family Stem Cell Institute at the Icahn School of Medicine; 15 years on the Board of the Metropolitan Museum of Art; and 10 years on the Board of Trustees of Dartmouth College. Mr. Black has served as a Trustee of the Museum of Modern Art ("MoMA") for approximately 25 years.

32. In 2007, Mr. Black and his wife, Debra, co-founded the Melanoma Research Alliance, which became the largest private funder of melanoma research in the world. The Melanoma Research Alliance has directly invested more than $150 million to advance cutting-edge research into immunotherapy for melanoma and some 30 other forms of cancer.

33. In 2020, Mr. Black and his wife co-founded The Foundation for OCD Research (FFOR) with $25 million to help develop treatment for Obsessive Compulsive Disorder.

34. The Blacks are also deeply invested in the support and long-term care of veterans. The Apollo Veterans Initiative was launched in 2014 and supports companies committed to hiring and retaining veterans, national guard, reserves, and military spouses and partners. Mr. Black and his family also fund a graduate student fellowship program for U.S. veterans and active-

duty military members at Harvard Kennedy School, Harvard Business School, and Harvard Law School. The fellowship program covers the annual cost of attendance of program participants and supports leadership development.

35. Mr. Black is highly active in the Jewish community, supporting Jewish causes and organizations including Jewish Lives, Park Ave Synagogue Educational Center, AIPAC and the UJA.

36. Defendant Robert Garcia is an individual and citizen of the State of California. He is the United States Representative for California's 42nd congressional district and, at all relevant times, has served as the Ranking Member of the U.S. House of Representatives Committee on Oversight and Government Reform. Congressman Garcia regularly appears on national television, including appearances on programs filmed and broadcast from studios in New York, New York.

## JURISDICTION AND VENUE

37. This Court has subject-matter jurisdiction under 28 U.S.C. § 1332(a) because this action is between citizens of different States and the amount in controversy exceeds $75,000, exclusive of interest and costs. Plaintiff Leon Black is a citizen of the State of New York, and Defendant Robert Garcia is a citizen of the State of California. Mr. Black seeks damages well in excess of the jurisdictional threshold.

38. This Court has personal jurisdiction over Congressman Garcia pursuant to N.Y. Civil Practice Law & Rules § 302(a)(1), because Mr. Black's claims arise from business that Congressman Garcia purposefully transacted in New York.

39. On September 14, 2026, Congressman Garcia traveled to, and appeared in person at, the MS NOW television studio in New York, New York, within this District. There, on the program *Money, Power, Politics with Stephanie Ruhle*, Mr. Garcia made, created, and published

the false and defamatory statements: “We’ve talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein’s trafficking network,” and “[He] was one of the last people to actually interact with [Epstein] before Jeffrey Epstein committed suicide.” Congressman Garcia made those statements in his private capacity as a media guest, not in connection with any official proceeding of the Committee or the House.

40. Congressman Garcia did not merely transmit these statements into New York from elsewhere. He purposefully traveled to New York and generated the defamatory content in this District. Mr. Black’s claims arise directly out of, and bear a substantial relationship to, Congressman Garcia’s activity in New York. By traveling to New York and deliberately making the false and defamatory statements from within the State, Congressman Garcia purposefully availed himself of the privilege of conducting activities here, and Mr. Black’s defamation claims arise directly from that in-State conduct.

41. His September 14, 2026, appearance in New York was not a one-time or incidental contact with New York. Since January 6, 2025, Congressman Garcia has appeared in person on at least two other television programs filmed and broadcast from New York. On or about January 6, 2025, Congressman Garcia appeared in person on the *11th Hour with Stephanie Ruhle*, broadcast from MSNBC (the former name of MS NOW), from New York. On or about December 4, 2025, Congressman Garcia appeared on *Watch What Happens Live with Andy Cohen*, broadcast by Bravo from New York. These repeated, in-person appearances on television programming produced and recorded in New York reflect a deliberate practice of availing himself of this State’s media platforms to project his statements to the public, and confirm that Congressman Garcia’s contacts with New York are purposeful rather than random, isolated, or fortuitous.

42. The exercise of personal jurisdiction over Congressman Garcia comports with due process. By traveling to New York, Congressman Garcia purposefully availed himself of the privilege of conducting activities in New York and invoked the benefits and protections of New York's laws, and he could reasonably anticipate being held to answer here for the injury those activities caused.

43. Venue is proper in this District under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to Mr. Black's claims occurred here—Congressman Garcia made and broadcast the false and defamatory statements from the MS NOW studio in New York, New York, which is located in the Southern District of New York.

## FACTS

### *Leon Black's Business Dealings with Jeffrey Epstein*

44. Mr. Black met Jeffrey Epstein in the mid-1990s, some eighteen years before he ever paid him for any services. At the time, Epstein served on the board of Rockefeller University and was associated with the Council on Foreign Relations, the Trilateral Commission, and a wide network of respected figures in finance, academia, science, and government. Mr. Black understood Epstein to have genuine expertise in tax, insurance, and trust and estate matters.

45. Mr. Black was aware that, in 2008, Epstein had pleaded guilty to state charges relating to prostitution involving a minor, but Epstein had represented to Mr. Black that the matter was an isolated incident arising from a fake identification. Several years after that conviction, Mr. Black—like many others—gave Epstein a second chance, a decision Mr. Black has since said he regrets.

46. Beginning in 2013, Mr. Black retained Epstein to advise him on tax, trust, and estate matters and on the operation of his family office. Epstein devised a solution to a significant estate-

planning problem that the other experts and lawyers Mr. Black had consulted were unable to solve—a problem that otherwise would have destroyed substantial value for Mr. Black's family.

47. Over approximately five years, Mr. Black paid Epstein $158 million for this work. As the independent investigation Mr. Black later commissioned confirmed, Epstein performed legitimate and valuable tax and estate-planning services, that work was responsible for billions of dollars in savings, and all of it was vetted by reputable law and accounting firms. Epstein had also falsely told Mr. Black that the fees were substantially tax-deductible, a representation Mr. Black learned only later was untrue.

48. Mr. Black neither participated in nor had any awareness of Epstein's crimes.

49. Epstein, as Mr. Black would later come to understand, exaggerated, manipulated, and lied prolifically, and his deceit extended well beyond Mr. Black, to include numerous other sophisticated people. Mr. Black severed his relationship with Epstein in 2018 after more than a year of mounting conflict over Epstein's escalating demands for money, his misrepresentations about the deductibility of his fees, and his failure to repay most of a $30 million demand loan Mr. Black had made to him.

50. Mr. Black cut all ties with Epstein in or about October 2018—more than nine months before Epstein's arrest in July 2019 and his death in August 2019.

51. When the full scope of Epstein's crimes became public, Mr. Black was appalled, expressed sympathy for Epstein's victims, and has said publicly that *he wishes he had never met or done business with Epstein*.

52. As described below, an independent investigation confirmed that Mr. Black had no awareness of, and no involvement in, any of Epstein's criminal activities.

53. While speaking to the Committee and subject to potential prosecution for any false statements, Mr. Black categorically denied the accusations against him. He has never abused a woman, never been with an underage woman, never engaged in sex trafficking, never paid Epstein for access to women, and was never blackmailed by Epstein. He had no involvement in, and no knowledge of, any of Epstein's criminal conduct. Mr. Black voluntarily went before the Committee to set the record straight.

***The Independent Investigation and Law-Enforcement Declinations***

54. Because he had nothing to hide, Mr. Black did something no one else in Epstein's orbit has done: He asked the independent directors of his company, Apollo, to commission a complete, unrestricted investigation of his relationship with Epstein—and to make the results public.

55. The Apollo Conflicts Committee retained the law firm Dechert LLP and placed no restrictions on its work. Dechert had full access to Mr. Black's financial records and correspondence.

56. The investigation was led by Andrew Levander, a nationally known former federal prosecutor from the U.S. Attorney's Office for the Southern District of New York.

57. Over approximately three months, Dechert reviewed more than 60,000 documents and interviewed more than 20 witnesses knowledgeable about Mr. Black's relationship with Epstein, including Mr. Black himself. He made himself available to answer every question asked of him.

58. Dechert issued its report in January 2021 (the "Dechert Report"), and Apollo filed it publicly as a securities disclosure—placing its conclusions on the public record more than five

years before Congressman Garcia's statements. The Dechert Report is attached hereto as Exhibit 1.

59. The Dechert Report concluded that Mr. Black paid Epstein $158 million for legitimate tax, estate-planning, and family-office services, that all of that work was vetted by major law and accounting firms, and that it saved Mr. Black billions of dollars.

60. Most important, the Dechert Report found no evidence that Mr. Black was involved in any way with Epstein's criminal activities at any time, and no evidence that Epstein ever introduced, or offered to introduce, Mr. Black to any underage women.

61. The investigation did not confine itself to Mr. Black's business dealings; it specifically examined his personal relationship with Epstein and ***found nothing connecting Mr. Black to Epstein's crimes.*** Specifically, it found:

a. "There is no evidence that Epstein ever introduced Black, or offered to introduce Black, to any underage woman." Exhibit 1 at 1.

b. "Socially, Black was friendly with Epstein and confided in Epstein regarding personal matters. Epstein would, at times, allude to their personal relationship when attempting to negotiate aspects of their business relationship, but Dechert has seen no evidence suggesting that either their professional or personal relationships ever touched upon Epstein's criminal activities or any other illegal activity." Exhibit 1 at 3.

c. "Black viewed Epstein as a confirmed bachelor with eclectic tastes, who often employed attractive women. However, Black did not believe that any of the women in Epstein's employ were underage. Black has no recollection of ever seeing Epstein with an underage woman at any time." Exhibit 1 at 8.

62. Law enforcement also concluded that Mr. Black had committed no crimes. Attorneys at the Wigdor firm affirmatively urged both the U.S. Attorney's Office for the Southern District of New York and the Manhattan District Attorney's Office to bring charges against Mr. Black. But given every opportunity to investigate, both offices declined because they were unable to corroborate any allegation of misconduct against Mr. Black.

***Mr. Black's Accusers Have Been Discredited***

63. For five years, a single plaintiffs' firm—Wigdor LLP (the "Wigdor firm")—has waged a campaign against Mr. Black in the courts and in the press, suing him on behalf of three different women who claimed ties to Jeffrey Epstein and leveling lurid accusations of sexual misconduct. Each of those three lawsuits has failed, and the most recent collapsed amid judicial findings of outright fraud. The accusations were, as Mr. Black testified, demonstrably baseless and entirely fabricated.

64. The first case, brought on behalf of Guzel Ganieva, was dismissed by a New York State court and the dismissal was affirmed on appeal. Transcripts of her conversations and text messages disproved her claims of abuse and demonstrated that she had signed an agreement not to disclose her relationship with Mr. Black voluntarily and without duress. *Ms. Ganieva never even met Epstein*.

65. The second case, brought on behalf of Cheri Pierson, was voluntarily dismissed with prejudice. *Mr. Black has never even met Ms. Pierson.*

66. The third case ended in disgrace for the accuser and her lawyers. On April 23, 2026, United States District Judge Jessica Clarke of the Southern District of New York issued a 76-page opinion finding that the plaintiff, proceeding as "Jane Doe," had fabricated evidence central to her

claims—including falsified sonograms—and that her Wigdor attorney had repeatedly lied to the court and to opposing counsel.

67. The fabrications the court confronted were extraordinary. The plaintiff had claimed, under oath, that she bore four of Epstein's children, three of whom were kidnapped at birth. She produced a fabricated journal asserting that she had been raped by some fifty men while in high school, including a former President and multiple Cabinet members. Wigdor had been warned before filing that the plaintiff was a fraud, yet the firm nonetheless went forward with her baseless claims.

68. In October 2026, the third lawsuit finally ended. On October 12, 2026, Jane Doe asked the court to dismiss her claim against Mr. Black with prejudice. Mr. Black did not settle with her, and he offered her nothing in exchange for the dismissal. On October 15, 2026, Judge Clarke granted Doe's request and dismissed the case with prejudice.

69. With that order, all three lawsuits that the Wigdor firm had filed against Mr. Black on behalf of women claiming ties to Epstein had been dismissed with prejudice.

70. These three women—and the single law firm that represented them—are Congressman Garcia's only source for his accusation that Mr. Black abused or trafficked women. Their claims were presented to the Manhattan District Attorney and the U.S. Department of Justice, and they were rejected. They were tested in state and federal court, and they failed.

***Garcia's False and Defamatory Statements***

71. On June 26, 2026—the same day he listened to Mr. Black's testimony—Congressman Garcia appeared on MS NOW and told a nationwide audience that "Leon Black is at the center of Jeffrey Epstein's crimes" (the "June 26 Statement").

72. On September 14, 2026, Congressman Garcia appeared on *Money, Power, Politics with Stephanie Ruhle* on MS NOW in New York City, and he stated that Mr. Black "was one of the last people to actually interact with [Epstein] before Jeffrey Epstein committed suicide," and that "we've talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein's trafficking network" (the "September 14 Statements").

73. The September 14 Statements were assertions of fact about Mr. Black, not expressions of opinion. Each stated or implied objectively verifiable facts: that Mr. Black participated in Jeffrey Epstein's sex-trafficking enterprise, that Mr. Black personally abused women, and that Mr. Black was among the last people to interact with Epstein before Epstein's death.

74. The September 14 Statements accused Mr. Black of serious crimes—sex trafficking and the physical and sexual abuse of women—and tended to expose him to public hatred, contempt, and ridicule and to injure him in his profession. The statements are defamatory on their face.

75. The June 26 Statement and September 14 Statements are false. Mr. Black did not participate in Jeffrey Epstein's trafficking network, was not involved in direct abuse of women, and is not at the center of Epstein's crimes. Mr. Black had no knowledge of and no involvement in any of Epstein's criminal activities.

76. None of the three women who filed lawsuits against Black are "survivors," nor have they "credibly" named Mr. Black as a participant in any abuse or trafficking. Each of them were plaintiffs represented by the sanctioned Wigdor firm, and all of their claims were dismissed.

77. Mr. Black was not "one of the last people to actually interact with" Epstein before his death. Mr. Black severed all contact with Epstein in October 2018—more than nine months before Epstein's arrest in July 2019 and his death in August 2019.

78. Congressman Garcia published the September 14 Statements, without privilege, to third parties—indeed, to a nationwide television audience and online audience that has repeated and amplified them.

79. Congressman Garcia did not make the statements at issue in a committee hearing, in floor debate, in a committee report, or through any other official proceeding or channel of the House of Representatives, and he did not make them at the direction or under the control of the House. He was not serving his constituents or otherwise carrying out his legislative responsibilities. He made them as an invited guest on a privately produced, commercial television program, speaking for himself.

80. To make the September 14 Statements, he traveled over 200 miles from Washington and from any proceedings of the Committee. He went to New York and appeared in person at MS NOW's studio. Congressman Garcia's presence in New York had nothing to do with the business of the House or the Committee. His statements were intended to defame a private citizen; they did not report on any findings of the Committee or advance any legislation.

81. Congressman Garcia cannot knowingly spread falsehoods to raise his public profile, buttress his re-election, or to stay in the limelight—all of which are divorced from and beyond the scope of any legitimate Congressional business.

### *Garcia Made His Defamatory Statements with Actual Malice*

82. At the time Congressman Garcia made the September 14 Statements, he knew each of the statements was false or, at a minimum, made it with reckless disregard for whether it was true.

83. Congressman Garcia personally attended the June 26, 2026 hearing at which Mr. Black testified, under oath, that he had no knowledge of and no involvement in Epstein's crimes, that he had severed his relationship with Epstein in 2018, and that the lawsuits accusing him of misconduct were baseless and that two of the three had been dismissed with prejudice, while the third faced case-crippling sanctions.

84. At the time of his June 26 Statement, Congressman Garcia already possessed proof that his accusations were false. The independent Dechert Report had been public since January 2021. Judge Clarke's sanctions opinion in Jane Doe's case was issued April 23, 2026. And Congressman Garcia had heard Mr. Black's sworn testimony in person earlier that same day.

85. By the time Congressman Garcia published the September 14 Statements, the evidence of the truth in Congressman Garcia's possession had only grown. On July 24, 2026, Mr. Black's counsel sent Chairman James Comer a detailed letter, copied to Congressman Garcia, explaining the Dechert Report's findings and that both the Department of Justice and Manhattan District Attorney had declined to pursue the allegations against Mr. Black. Congressman Garcia nonetheless appeared on national television on September 14 and repeated vile accusations as fact.

86. Congressman Garcia persisted in his false and preconceived narrative after receiving still more proof of its falsity, and refused every opportunity to correct the record. The day after the September 14 Statements, Mr. Black's counsel wrote directly to Congressman Garcia, detailing the three discredited Wigdor lawsuits. On October 15, the last of the three lawsuits was

dismissed with prejudice. And on October 19, undersigned counsel sent Congressman Garcia a detailed demand letter identifying each false statement, enclosing the supporting evidence, and requesting a retraction within seven days. Congressman Garcia's office acknowledged receipt of the October 19 letter, but did not retract or correct any statement, and the statements remain publicly available.

87. Congressman Garcia's decision to repeat accusations he had been shown—with documented proof—to be false reflects a deliberate and purposeful avoidance of the truth. He acted with actual malice.

88. Congressman Garcia had personal and political incentives to disregard the truth and tell his preconceived narrative. Linking Mr. Black, a prominent citizen and philanthropist, to Epstein's crimes kept Congressman Garcia in the public spotlight and advanced his own re-election prospects. These incentives do not excuse his conduct; on the contrary, they explain his willingness to disregard the overwhelming evidence of falsity that was in his possession.

***Mr. Black Has Suffered, and Continues to Suffer, Significant Harm from the Defamatory Statements***

89. Congressman Garcia's accusations were not made in a void. He is the Ranking Member of the House Oversight Committee, he commands a large national platform, and he made these statements both on national television and republished them on his social-media accounts, knowing that his words would be repeated and amplified by the media and the public. Asserting as fact that a man is a sex trafficker and an abuser of women, when paired with a connection to Jeffrey Epstein, leveled by a sitting member of Congress, travels instantly and widely—just as Congressman Garcia intended.

90. As a sitting Member of the House of Representatives, Congressman Garcia's words carry more weight than those of an average person. Many people will assume that he has a factual

basis for the things he says to the media because he has access to information the general public does not. Lies from a person in his position can have devastating consequences, as they have for Mr. Black.

91. Congressman Garcia's false accusations also placed Mr. Black and his family in physical danger. False claims that someone is a sex trafficker and abuser of women—and tying that person to Jeffrey Epstein—especially when said by a sitting member of Congress on national television, travels widely across the country. As a result, Mr. Black has been subjected to a torrent of public harassment and online campaigns openly calling for his death.

92. The following examples are representative of the hateful and threatening messages—emails, phone calls, letters, and social media posts—that have been directed at him, many of which refer to the very accusations Congressman Garcia made:

93. A voicemail received on September 8, 2026 stated: "Leon. Leon, just fucking hang yourself, buddy. You're fucking despicable piece of shit. Just hang yourself. Kill yourself, man. You're a piece of shit."

94. On October 27, 2026, an individual posted on X: "Leon Black an Illuminati freemason scumbag child rapist pedophile. They all need a short walk to a public guillotine."


Bonnie
@FrequencyisKey1

Leon Black an Illuminati freemason scumbag child rapist pedophile. They all need a short walk to a public guillotine.

1:38 AM · Oct 27, 2026 · 38 Views

95. A voicemail received on September 5, 2026 said: "Yeah, Leon Black, he's a disgusting pedophile and a sicko pervert, and I hope you guys aren't doing anything with him because he's he's he's disgusting and I'm going to fuck him up. Once once I get a hold of him, I'm going to choke that fucker."

96. Many of the messages also reflect the horrific belief that Mr. Black is a pedophile or child rapist:

97. An email received September 3, 2026 said: "Is Jewishlives.org unaware of Leon Black being a pedohphile? [sic] Such glowing support for such a vile human is both confusing and surprising to me. I think it's something worth looking into before aligning yourself so publicly with a pedohphile."

98. A voicemail on September 18, 2026 said: "Yeah, just to reminder that your boss is a pedophile, a child rapist, a piece of shit, and is about to rot in prison for the rest of his fucking life."

99. Another email on September 2, 2026 said: "You forgot to mention Leon black fucks little girls. He deserves the worst"

100. Another social media post:




101. On October 6, 2026, an activist group placed a large volume of posters near Apollo Global Management's offices in New York calling for Mr. Black's removal from MoMA's Board of Trustees. The poster labeled Mr. Black as "Epstein's close friend and accused rapist" and urged MoMA to "stop protecting this abuser." His family, friends, and professional colleagues come face-to-face with these hateful messages as well, as they were plastered all over Midtown Manhattan.




102. These are just a few examples of the hate and vitriol that has been directed at Mr. Black and his family in the wake of Congressman Garcia's indefensible, dangerous, and defamatory statements.

103. The volume and severity of these threats has been so severe that Mr. Black had to retain Max Security for an executive-protection detail, residence security, protective intelligence, and tactical monitoring to protect himself and his family, at a cost of over $775,000 for June through October 2026, and with expenses exceeding $100,000 per month. Max Security has assessed the physical risk to Mr. Black as "HIGH."

104. These threats are a constant and continuing concern for Mr. Black and his family, and he has incurred, and continues to incur, substantial expense for personal security as a direct result.

105. Congressman Garcia's statements have also inflicted grave and lasting injury to the reputation Mr. Black spent a lifetime building—as the co-founder of one of the world's largest investment firms and as one of the nation's leading philanthropists in the arts, education, and

medical research. To be branded a participant in Jeffrey Epstein's sex-trafficking crimes is to be associated with some of the most reviled conduct imaginable, and the accusation has exposed Mr. Black to public hatred, contempt, and ridicule and injured him in his profession and community, including among business, philanthropic, and political connections in New York, New York.

106. Congressman Garcia's false statements have inflicted real and measurable harm on Mr. Black. Mr. Black has spent decades building a hard-earned reputation for integrity as one of the nation's foremost investors and philanthropists. That reputation has been gravely undermined by Congressman Garcia's fabricated and false accusations. The lies have eroded Mr. Black's standing in the business community, interfered with his ability to raise capital and carry on his professional activities, and damaged relationships he spent a career building. Those consequences are concrete: prospective investors, confronted with Congressman Garcia's public lies, now question Mr. Black's integrity and have declined to proceed in investment opportunities. These losses are substantial and continuing.

107. The injury has been personal as well as financial. Mr. Black and his family have endured public condemnation of Mr. Black as a participant in Epstein's crimes, causing him severe and sustained emotional distress, humiliation, and mental anguish. Because Congressman Garcia's statements remain publicly available and uncorrected, the injury to Mr. Black's reputation and safety is ongoing and will continue absent relief.

## **CAUSES OF ACTION**
## **COUNT ONE: DEFAMATION**

108. Mr. Black incorporates and realleges paragraphs 1 through 107 as if fully set forth herein.

109. On September 14, 2026, Congressman Garcia appeared on *Money, Power, Politics with Stephanie Ruhle* on MS NOW and falsely stated that Mr. Black "was one of the last people

to actually interact with [Epstein] before Jeffrey Epstein committed suicide," and that "we've talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein's trafficking network." These statements were broadcast to a nationwide television and online audience that has repeated and amplified them.

110. Congressman Garcia spoke the September 14 Statements on a television program that was broadcast to a nationwide television and online audience. A defamatory statement broadcast by television is libel under New York law.

111. Mr. Black was not "one of the last people to actually interact with" Epstein before his death. Mr. Black severed all contact with Epstein in October 2018.

112. None of the three women who filed lawsuits against Black are "survivors," nor have they "credibly" named Mr. Black as a participant in any abuse or trafficking. All of the claims made by these women have been dismissed.

113. Mr. Black did not participate in Jeffrey Epstein's trafficking network and was not involved in direct abuse of women. Mr. Black had no knowledge of and no involvement in any of Epstein's criminal activities.

114. Congressman Garcia's September 14 Statements were assertions of objectively verifiable fact about Mr. Black, not expressions of opinion.

115. Congressman Garcia's September 14 Statements were not privileged or protected.

116. Congressman Garcia acted with actual malice and/or acted with reckless disregard for the truth when he knowingly and intentionally went on television and made these false accusations against Mr. Black.

117. At the time of his September 14 Statements, Congressman Garcia possessed proof that his accusations and preconceived narrative about Mr. Black were false, including at least Mr. Black's sworn testimony in his transcribed interview, the Dechert Report, Judge Jessica Clarke's sanctions opinion in the Jane Doe case, and the July 24 letter from Mr. Black's counsel to Chairman Comer and Congressman Garcia.

118. Congressman Garcia has ignored and refused Mr. Black's demand, through counsel, to retract or correct his false statements.

119. Congressman Garcia's false September 14 Statements were made in furtherance of his preconceived narrative to further his own personal and political interests and ambitions.

120. Congressman Garcia's defamatory September 14 Statements about Mr. Black were not made within the scope of his employment or duties as a Member of the United States House of Representatives.

121. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has incurred substantial expense for private security services and monitoring to protect himself and his family.

122. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has suffered and continues to suffer humiliation, mental anguish, ridicule, and disgrace.

123. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has received threats to his life and safety and has been publicly labeled as a pedophile and child rapist.

124. As a direct and proximate result of Congressman Garcia's defamatory September 14 Statements, Mr. Black has suffered presumed damages, injury to his reputation, humiliation,

mental anguish, and threats to his safety, and has incurred substantial expenses for his private security, in amounts to be determined at trial.

125. Congressman Garcia made the September 14 Statements with common-law malice—that is, out of hatred, ill will, or in willful and reckless disregard of Mr. Black's rights, as demonstrated by his persistence in repeating accusations he had been given documented proof were false, and by the personal and political motives alleged above. Mr. Black is therefore entitled to punitive damages.

## COUNT TWO: DEFAMATION PER SE

126. Mr. Black incorporates and realleges paragraphs 1 through 107 as if fully set forth herein.

127. On September 14, 2026, Congressman Garcia appeared on *Money, Power, Politics with Stephanie Ruhle* on MS NOW and stated that Mr. Black "was one of the last people to actually interact with [Epstein] before Jeffrey Epstein committed suicide," and that "we've talked to survivors that have credibly named Leon Black as someone that was involved in direct abuse of women and was directly involved with Jeffrey Epstein's trafficking network." These statements were broadcast to a nationwide television and online audience that has repeated and amplified them.

128. Congressman Garcia spoke the September 14 Statements on a television program that was broadcast to a nationwide television and online audience. A defamatory statement broadcast by television is libel under New York law.

129. Mr. Black was not "one of the last people to actually interact with" Epstein before his death. Mr. Black severed all contact with Epstein in October 2018.

130. None of the three women who filed lawsuits against Black are "survivors," nor have they "credibly" named Mr. Black as a participant in any abuse or trafficking. All of the claims made by these women have been dismissed.

131. Mr. Black did not participate in Jeffrey Epstein's trafficking network and was not involved in direct abuse of women. Mr. Black had no knowledge of and no involvement in any of Epstein's criminal activities.

132. Congressman Garcia's September 14 Statements were assertions of objectively verifiable fact about Mr. Black, not expressions of opinion.

133. Congressman Garcia's September 14 Statements were not privileged or protected.

134. The September 14 Statements were false statements of fact concerning Mr. Black, published without privilege to third parties, and made with actual malice, as alleged above.

135. The September 14 Statements are defamatory per se. They charge Mr. Black with serious crimes—participation in Jeffrey Epstein's sex-trafficking network and the direct abuse of women—of the kind that New York recognizes as actionable without proof of special damages.

136. The September 14 Statements are independently defamatory per se because they tend to injure Mr. Black in his trade, business, and profession. Mr. Black built a decades-long career and reputation for integrity as the co-founder of one of the world's largest investment firms and as a leading philanthropist, and a false accusation that he participated in sex trafficking and the abuse of women is incompatible with the proper conduct of that business and profession.

137. Because the September 14 Statements are libel that is defamatory per se, injury to Mr. Black is presumed, and Mr. Black is entitled to recover general and presumed damages without pleading or proving special damages.

138. Congressman Garcia acted with actual malice and/or acted with reckless disregard for the truth when he knowingly and intentionally went on television and made these false accusations against Mr. Black.

139. At the time of his September 14 Statements, Congressman Garcia possessed proof that his accusations and preconceived narrative about Mr. Black were false, including at least Mr. Black's sworn testimony in his transcribed interview, the Dechert Report, Judge Jessica Clarke's sanctions opinion in the Jane Doe case, and the July 24 letter from Mr. Black's counsel to Chairman Comer and Congressman Garcia.

140. Congressman Garcia has ignored and refused Mr. Black's demand, through counsel, to retract or correct his false statements.

141. Congressman Garcia's false September 14 Statements were made in furtherance of his preconceived narrative to further his own personal and political interests and ambitions.

142. Congressman Garcia's defamatory September 14 Statements about Mr. Black were not made within the scope of his employment or duties as a Member of the United States House of Representatives.

143. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has incurred substantial expense for private security services and monitoring to protect himself and his family.

144. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has suffered and continues to suffer humiliation, mental anguish, ridicule, and disgrace.

145. As a direct and proximate cause of Congressman Garcia's defamatory statements, Mr. Black has received threats to his life and safety and has been publicly labeled as a pedophile and child rapist.

146. As a direct and proximate result of Congressman Garcia's defamatory September 14 Statements, Mr. Black has suffered presumed damages, injury to his reputation, humiliation, mental anguish, and threats to his safety, and has incurred substantial expenses for his private security, in amounts to be determined at trial.

## RELIEF REQUESTED

WHEREFORE, Mr. Black requests that judgment be entered in his favor and against Defendant Robert Garcia, awarding:

1. Compensatory damages in an amount not less than $2,500,000;
2. Punitive damages in the amount of $5,000,000;
3. Costs and expenses, including reasonable attorneys' fees to the extent recoverable by law;
4. Prejudgment and post judgment interest to the extent permitted by law; and
5. Any such other and further relief as the Court deems just and appropriate.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, the Plaintiff demands a trial by jury.

Dated: November 4, 2026

Respectfully submitted,

Courtney R. Forrest (*pro hac vice* forthcoming)
Zachary N. Adorno (*pro hac vice* forthcoming)
KAISER PLLC
1100 Vermont Ave, NW
Suite 200
Washington, D.C. 20005
Tel: (202) 640-2850
cforrest@kaiserlaw.com
zadorno@kaiserlaw.com

*/s/ Aaron Cutler*
HOGAN LOVELLS CADWALADER LLP
Aaron Cutler (*pro hac vice* pending)
200 Liberty Street
New York, NY 10281
Tel: (212) 504-6000
aaron.cutler@hlc.com

ESTRICH GOLDIN LLP
Susan Estrich (*pro hac vice* forthcoming)
947 Berkeley St.
Santa Monica, CA 90403
(213) 399-2132
susan@estrichgoldin.com

*Attorneys for Plaintiff Leon Black*